IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL SERREL JOHNSON,<br><br>Defendant. | CR 15-13-BLG-SPW-CSO<br><br>**FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE** |

I.   **INTRODUCTION**

On November 6, 2015, Judge Watters referred to the undersigned, in accordance with 28 U.S.C. § 636(b)(1)(B) and Rule 59(a), Fed. R. Crim. P., Defendant Michael Serrel Johnson's ("Johnson") Motion to Suppress (*ECF 28*)[1] for the purposes of conducting a hearing and issuing appropriate findings and recommendations.  Johnson is charged with Possession with Intent to Distribute Methamphetamine, in violation of Title 21 U.S.C. § 841(a)(1).  *See Indictment* (*ECF 1*).  His pending motion seeks to suppress evidence recovered as a result of the

---

[1] "ECF" refers to the document as numbered in the Court's Electronic Case Files.  *See The Bluebook, A Uniform System of Citation, § 10.8.3*.

traffic stop on August 21, 2014, and the subsequent search warrant issued by a State of Montana District Judge on August 22, 2014. *ECF 28*.

Johnson asserts that the evidence obtained as a result of the stop and the subsequent search warrant should be suppressed because: (1) the trooper prolonged the traffic stop beyond the time reasonably required to complete the "mission" of the stop; and (2) prolonging the stop was unlawful because the trooper did not have particularized suspicion that Johnson was engaging in drug trafficking. *See ECF 29*.

The Court held a hearing on December 21, 2015. Having considered the parties' arguments and submissions, the Court will recommend that the motion to suppress be denied.

## II. **BACKGROUND**

The Court heard testimony from Trooper Quinnell ("Quinnell"), a well-experienced and well-trained highway patrolman who made the traffic stop. The following facts are taken from the hearing testimony and exhibits attached to the parties' briefs, including the WatchGuard video recorded by Quinnell during the traffic stop.

On August 21, 2014, while patrolling I-90 near Glendive Montana, Quinnell initiated a traffic stop on a large red SUV after seeing the vehicle several times cross over the fog line on the right side of the road. *ECF 29* at 1. He noted that it took longer than expected for the vehicle to pull over, but it did eventually take a highway exit and pull over to the side of the road.

Quinnell then exited his patrol car and approached the vehicle from the passenger side. *Video at 1:57*. In talking with the driver, Quinnell learned that his name was Michael Serrel Johnson. Quinnell obtained Johnson's driver's license and his car rental agreement. Johnson's vehicle had Nevada license plates, but Johnson said that he was traveling from California. Quinnell verified that Johnson's driver's license was valid. *WatchGuard Video* (*ECF 30*) *at 9:38*.[2]

Quinnell noted that the car rental was a long-term rental, and the vehicle was not going to be returned until October 2014. He thought this was unusual because it was the first time, in 15 years in law enforcement, that he had seen a long-term vehicle rental by an

---

[2] References to the "*Video*" are to the *WatchGuard Video* filed as *Defendant's Exhibit 1, ECF 30*.

individual. He also thought it was unusual to rent such a large fuel-inefficient vehicle to drive long distances with little cargo. Additionally, he testified that he was aware that rental vehicles are commonly used by drug traffickers, and for human trafficking and gun trafficking. He testified that he knew rental vehicles were common for traffickers because their names would not immediately "pop-up" with the vehicle and, if it was seized, they would not lose one of their assets. He estimated that he has found approximately 20 rental vehicles used to traffic drugs in the past.

Next, Quinnell learned that the sole passenger, a female, was unrelated to the driver, that there was a significant age difference, and that they were traveling together after knowing each other for only a brief time. As a result, he decided to ask the passenger some questions to ensure that she was not there against her will. Quinnell noted that he was concerned when the passenger was not able to provide any means of identification. He testified that this concerned him because it meant it would be difficult to verify her identity or to learn whether she had any criminal history. He wanted to make sure that she had no

history of prostitution, based on his concerns of potential human trafficking.

These concerns were heightened by her statement that she was traveling to North Dakota to seek employment. Quinnell testified that he thought it was unusual for someone to be moving to a new place to seek employment, but have no identification and very little luggage.

Johnson told Quinnell that he worked as a drywaller, and this also raised Quinnell's suspicions. Quinnell did not find credible Johnson's story about working as a drywaller because, based on Quinnell's experience and knowledge, he did not believe the car would not be spotless if it had drywall tools in it. He also did not think Johnson looked like he worked in that industry because his hands were not calloused and dry, as is typical for such employment. His suspicions also were aroused because Johnson, whose story seemed to be false, was traveling from a known drug source state, through a drug corridor, to a high-drug distribution area.

Next, Quinnell testified that he saw three phones in the car during his initial approach. One of the phones he saw was a flip phone, which he thought was likely a TracPhone. Quinnell testified that this

was also indicative of criminal behavior because it would not have much personal information on it. He also saw multiple air fresheners and laundry detergent in the vehicle. Quinnell testified that he knew these were often used by drug traffickers to mask odors and that rental vehicles normally do not need or use air fresheners because they are cleaned so often.

After Quinnell initially made contact with Johnson he returned to his patrol car and then realized that he had not yet turned on his microphone. *Video at 8:19*. Once the microphone was on, Quinnell is heard telling the other officer in the patrol car that Johnson's vehicle was spotless and "it's a rental, yeah. You know, it just doesn't make a lot of sense. He says he does drywall." *Video at 8:37*.

Quinnell later returned to the vehicle to talk with Johnson to confirm that he not impaired as a driver. For this reason, he asked Johnson to step out of his vehicle. *Video at 11:54*. During their conversation, Johnson told Quinnell this was his third trip to the area since May. *Video at 13:15*. Quinnell explained to Johnson that he was asking questions because there are a lot of drugs in the area coming from Nevada and California. *Video at 13:55*. After determining that

Johnson was not impaired, Quinnell asked him to return to his vehicle and told him that he was going to receive a warning ticket for the traffic violation. *Video at 14:48*.

After returning to his patrol vehicle, Quinnell spoke to a dispatch officer, who confirmed that there were no outstanding warrants for Johnson. Quinnell asked the other officer whether he saw much luggage, and the officer responded that he didn't see any luggage in the back seat but he couldn't see clearly into the back of the SUV. *Video at 17:20*. He also told Quinnell he saw two phones, and that he didn't know "if that big box was a cell phone one, but it's about the size of one." *Video at 17:41*. Dispatch then provided the criminal history for the passenger, which showed a parole violation for possession of a controlled substance. *Video at 18:48*. Quinnell then decided that he was going to ask some more questions related to learning what may be in vehicle. *Video at 23:00*.

When the officers walked back to Johnson's vehicle, Quinnell gave Johnson a warning ticket for the traffic violation and then asked the passenger to step out of the vehicle for a minute to talk. *Video at 26:36*. He asked the passenger about her drug history and then about how

much luggage she had in the vehicle. *Video at 27:00*. She told Quinnell that her drug possession charge, initially a felony but reduced to a misdemeanor, was for possession of methamphetamine. She also told him that she only had one bag and she consented to allowing Quinnell to search it. *Video at 27:44*. Rather than search her bag, however, Quinnell decided to ask Johnson more questions. *Video at 28:55*.

Quinnell asked Johnson how much luggage he had and Johnson responded that he had one bag and some weights. *Video at 29:10*. While Johnson was determining whether to give Quinnell consent to search the vehicle, Johnson opened the back end of the vehicle. *Video at 29:45*. Quinnell testified that he was further suspicious that Johnson had opened the back because that did not usually happen and was consistent with an attempt to air out the vehicle to dissipate any odors. He knew that Johnson had likely seen the indication on Quinnell's vehicle that indicated he had a drug dog with him that could detect the scent of narcotics.

After Johnson denied consent to search, Quinnell told him that he has reasonable suspicion to run his dog around the vehicle. *Video at 31:12*. He told these travelers that if his narcotics dog "doesn't indicate

on the vehicle, it's a done deal, you guys are out of here. . . Quick and easy." Johnson and the passenger got back into the vehicle and the doors were all closed as the dog sniff was conducted. *Video at 31:32.*

After the dog sniff, Quinnell told Johnson that his "dog has indicated to the presence of the odor of narcotics here at this back door;" and that he has probable cause to seize the vehicle and get a search warrant. *Video at 34:09.*

### III. **LEGAL STANDARD**

The United States Supreme Court recently held that an officer must have reasonable suspicion to conduct a dog sniff of a vehicle as a result of a traffic stop if the dog sniff prolongs the stop beyond the time necessary to address the traffic violation itself. *Rodriguez v. U.S.*, 135 S. Ct. 1609, 1614 (2015). Tasks involved in addressing a traffic violation include ordinary inquiries incident to the stop, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* But if a stop is prolonged beyond these tasks, an officer needs reasonable suspicion. *Id.*

Reasonable suspicion is more than a mere hunch but "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002). Reasonable suspicion may exist even where "factors which by themselves were 'quite consistent with innocent travel' collectively amounted to reasonable suspicion." *Id.* (citing *U.S. v. Sokolow*, 490 U.S. 1, 9 (1989)). Thus, courts must examine, based on the totality of the circumstances, "whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *U.S. v. Cortez*, 101 S. Ct. 690, 695 (1981)). Considering the totality of the circumstances "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.' " *Id.*

To determine whether a prolonged stop is justified in duration, the Court considers "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."

*U.S. v. Sharpe*, 470 U.S. 675, 686 (1985). On a motion to suppress evidence, the "officer has the initial burden of production" to show "specific articulable facts to justify a reasonable suspicion." *U.S. v. Willis*, 431 F.3d 709, 724 (9th Cir. 2004) (internal quotations omitted). The Defendant, however, "has the ultimate burden of proof." *Id.*

## IV. ANALYSIS

The United States concedes that Quinnell extended the stop beyond the time necessary to address the traffic violation. *ECF 37* at 9. Thus, the primary issue here is whether Quinnell had reasonable suspicion to extend the stop.

The United States points to several factors in asserting Quinnell had reasonable suspicion that Johnson was engaged in drug trafficking. Specifically, it argues that: (1) Johnson was traveling in a high-drug traffic area; (2) Johnson was on his third trip to the area since May 2014, from a drug-source state; (3) Johnson was driving a rental vehicle, which Quinnell thought was relevant because drug couriers often use rental vehicles; (4) the rental vehicle was large and expensive, which seemed unusual based on the minimal amount of luggage in the vehicle; (5) there were four cell phones in the car, three Johnson claimed were

his, which Quinnell thought was suggestive of drug trafficking; (6) of the four cell phones in the vehicle, one appeared to be a TracFone, which Quinnell also found suspicious because TracFone's are often used by drug traffickers because they do not require subscriber information; (7) Johnson's story about his work seemed questionable because the vehicle was spotless and he did not appear to have calloused and chafed hands, as would be usual for people working with drywall; (8) the officer observed air fresheners and laundry detergent in the vehicle, which are often used to conceal the scent of narcotics; and (9) the passenger had a drug-related conviction, including a recent charge for possession of a controlled substance. *ECF 37 at 7-13.*

Johnson argues that the Court "must look at what Quinnell knew at the time the 'mission' of the traffic stop was complete." *ECF 29* at 15. He argues that driving a rental car in a known drug corridor is not enough. *Id.* at 16. But during this stop, much like the stop in *Rodgers*, new particularized factors continued to arise throughout the stop, which supported the continued detention. *Rodgers*, 656 F.3d at 1027. In *Rodgers*, the officer "obtained bits and pieces of suspicious information over time that required additional investigation." *Id.* As Quinnell

asked questions throughout the stop, he continually learned new information that raised his suspicions about illegal activity.

In addition to the factors listed above, Quinnell's testimony provided further justification for the prolonged stop. He stated that during his first conversation with Johnson he noticed all of the factors listed above, with three exceptions: (1) he had only noticed three phones initially; (2) he was only aware of one trip from California; and (3) he was not yet aware of the passenger's drug history. But in addition to those factors, Quinnell testified that he was concerned about human trafficking as well, which is why he wanted to know the identity and criminal history of the passenger. Quinnell intended to use this information to verify her identity and confirm she was there voluntarily. Quinnell also noted that the air fresheners were particularly unusual not just because they are used to mask odors, but also because it was a rental vehicle. As noted above, he explained that it was unusual for him to see air fresheners in rental vehicles because they are cleaned so often.

Based on Quinnell's concerns, he initially prolonged the stop to ask a few questions about the luggage in the vehicle, which was a quick

way to confirm or dispel his suspicions about drug trafficking. But the answers to his questions created more suspicion, rather than dispelling his concerns. Although the passenger claimed to be looking for a new job and moving to a new region of the country, she had very few belongings with her and no identification. Her criminal history involving possession of controlled substances added to Quinnell's concern that they were engaged in drug trafficking. Considered in combination, these factors created articulable grounds for suspicion that continued to unfold throughout the stop. *See* Rodgers, 656 F.3d at 1027.

The Court, in evaluating the duration and the scope of the prolonged stop, must look not only to whether the officer had reasonable suspicion, but also to whether he diligently pursued his investigation in a way that quickly confirmed or dispelled his suspicions. *Sharpe*, 470 U.S. at 686. There is not a specific time limit to measure whether the duration of the stop is reasonable, and the Court instead looks to the circumstances surrounding the stop. *U.S. v. Torres-Sanchez*, 83 F.3d 1123, 1127 (9th Cir. 1996), *as amended* (July 15, 1996). Here, approximately seven minutes elapsed from the time the warning ticket

was issued to Johnson to the time the dog alerted to the presence of narcotics. Quinnell briefly asked questions and then conducted the dog sniff of the vehicle. The entire stop, prior to the dog alerting for the odor of narcotics, was thirty-four minutes.

Based on the totality of the circumstances and the articulable facts that led Quinnell to have a reasonable suspicion Johnson was involved in drug trafficking, the Court concludes here that Trooper Quinnell diligently pursued his investigation. After Quinnell asked questions regarding the luggage in the vehicle, he decided to take action that would confirm or dispel his suspicions quickly—a dog sniff of the vehicle.

Quinnell had reasonable suspicion to prolong the stop beyond the intended purpose of issuing a traffic warning to Johnson and he acted diligently in confirming his suspicions. The factors cited by Quinnell gave him reasonable suspicion to prolong the stop. He acted diligently in conducting a dog sniff of the vehicle. Accordingly, the Court recommends that Johnson's motion to suppress be denied.

## V. **CONCLUSION**

Based on the foregoing, IT IS RECOMMENDED that Johnson's Motion to Suppress (*ECF 28*) be DENIED.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties. The parties are advised that objections to these Findings and Recommendations are waived unless filed and served within fourteen (14) days after the filing of the Findings and Recommendations. 28 U.S.C. § 636(b)(1)(B); Fed. R. Crim. P. 59(b)(2).

DATED this 24th day of December 2015.

/s/ *Carolyn S. Ostby*
United States Magistrate Judge